# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| VICTORIA L. KREGER, | CIVIL NO. 10-3095 (PAM/TNL) |
| PLAINTIFF, | |
| V. | **REPORT & RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| MICHAEL ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | |
| DEFENDANT. | |

Edward C. Olson, Attorney at Law, 331 2nd Avenue South, Suite 420, Minneapolis MN 55401, for Plaintiff.

Lonnie F. Bryan, Assistant United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis MN 55415, for Defendant.

## I.   INTRODUCTION

Plaintiff Victoria L. Kreger (Plaintiff) brings the present action, disputing Defendant Commissioner of Social Security's (Commissioner) denial of her protective application for disability insurance benefits (DIB).  This matter is before the Court, Magistrate Judge Tony N. Leung, for a report and recommendation to the United States District Court Judge on the parties' cross motions for summary judgment.  *See* 28 U.S.C. § 636(b)(1); D. Minn. LR 72.1-2.

Based on the reasons set forth herein, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (Docket No. 11) be **DENIED**; the Commissioner's Motion for Summary Judgment (Docket No. 18) be **GRANTED**.

II.    **FACTS**

a.    <u>**Procedural Posture**</u>

Plaintiff was born in 1961 and was 44-years old on July 27, 2005, when she filed her application for DIB, with a protective filing date of July 26, 2005.[1] (Tr. 16, 68, 1255.) Plaintiff alleged an onset date of January 1, 2003. (Tr. 16, 75, 98.) Plaintiff's applications were denied on December 1, 2005 (Tr. 33), and upon reconsideration on March 7, 2006. (Tr. 42, 44.) Thereafter, Plaintiff requested a hearing before an ALJ. (Tr. 48, 50.) On June 29, 2007, Plaintiff had a hearing before ALJ James Geyer. (Tr. 16.)

In his opinion, dated October 17, 2007, (Tr. 13), the ALJ found and concluded as follows: Plaintiff has not engaged in substantial gainful activity since January 1, 2003. (Tr. 22.) Plaintiff has a history of fibromyalgia, chronic fatigue syndrome, degenerative disc disease, and depression, which are considered to be "severe impairments" under 20 C.F.R. § 404.1520(e). (Tr. 22.) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments of 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.04 or 12.06. (Tr. 22.) Plaintiff has the residual functional capacity to

> lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, is unlimited in push and/or pull activities (including operation of hand and/or foot controls) other than as shown for lift and/or carry, who is markedly limited in an ability to understand, remember, and carry out detailed instructions, and moderately limited in an ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances, complete a normal workday and workweek without interruptions and psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact

---

[1] Plaintiff notes that her protective filing date was actually July 18, 2005. (Tr. 94.)

appropriately with the general public and respond appropriately to
changes in the work setting.

(Tr. 24.) Plaintiff is unable to perform her past relevant work as a bookkeeper, city administrator, and landfill manager (Tr. 28), but considering Plaintiff's age, education work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform because Plaintiff can perform light work occupations such as sub-assembler, assembler of small parts, fishing rod assembler, vacuum assembler, and bottle assembler. (Tr. 29.) Plaintiff can also perform the sedentary jobs of final assembler, fishing reel assembler, and lamp shade assembler. (Tr. 30.) Therefore, Plaintiff has not been under a disability within the meaning of the Social Security Act from January 1, 2003 through October 17, 2007. (Tr. 30.)

Plaintiff requested a review of the ALJ's decision. (Tr. 12.) The Appeals Counsel denied Plaintiff's request for review on June 7, 2010. (Tr. 8.)

### b. **Employment Background**

Plaintiff graduated from high school with honors and studied accounting in college for two years. (Tr. 724.) Plaintiff received employment earnings from 1983 through 2002. (Tr. 83, 99. 113-22; *see also* Tr. 124-30.) Plaintiff worked as bookkeeper and site manager for a landfill company from March 1983 through August 1997. (Tr. 99) Plaintiff worked part time as a bookkeeper for a construction company from 1998 through 2001. (Tr. 99.) Plaintiff worked as city administrator for the City of Hanover from 2001 to May 2002. (Tr. 80, 99.) Plaintiff worked part time as legal assistant from September 16, 2002, to November 30, 2002. (Tr. 79, 99.) Plaintiff worked part time as a bookkeeper from March 2003 through December 2003. (Tr. 99.) Finally, Plaintiff worked part time as a gravel sampler for a construction company from June 2004 through July 2004. (Tr. 99, 691.) Plaintiff reported that she stopped working on June 27,

3

2004, "[b]ecause of [her] condition." (Tr. 98.) In her part time positions Plaintiff worked two

days per week for between six and eight hours per day. (Tr. 99.) In her other positions, Plaintiff

worked five days per week for ten hours per day. (Tr. 99.)

Plaintiff's past positions varied in terms of their exertional requirements. (Tr. Tr. 147-54.)

Plaintiff's past positions generally required that she frequently walk, stand, sit, climb, write, and

reach. (Tr. 148-54.) Her positions also required her to occasionally lift 20 pounds and frequently

lift 10 pounds. (Tr. 148-54.) Her positions did not generally require her kneel, crouch, crawl, or

handle objects. (Tr. 148-54.)

    **c.**   **Medical Records**

        **i.**  **Records Dealing with Physical Medical Conditions[2]**

             1.  <u>Treatment Records from 1997 through 2002</u>

In December 1997, Plaintiff saw Dr. Nancy Meryhew, who concluded that Plaintiff

probably had systemic lupus erythematosus (SLE or lupus)[3] "as characterized by constitutional,

skin and joint involvement and associated with significant positive [antinuclear antibody or]

ANA response." (Tr. 1052.) Dr. Meryhew also noted that Plaintiff's symptoms were complicated

by significant depression and psychosocial stressors. (Tr. 1052.) Plaintiff reported that despite

---

[2] The record in the present action is a voluminous 1,320 pages. Plaintiff's medical records include treatment notes for Plaintiff's respiratory issues (Tr. 291, 294, 284, 302, 356, 430, 440, 560, 788-90, 850-51, 854, 923-24,), digestive tract issues (Tr. 291, 294, 289, 303, 342-43, 352, 410-11, 441, 444-45, 567-68, 570, 572, 624-31, 649, 662-63, 666-69, 672, 676-78, 694-97, 741-44, 776, 935, 1173), and carpal tunnel syndrome (Tr. 436, 468, 566, 577-78, 580, 582, 738-40). While this Court has review the entire record, this Court has excluded, from the summary in this report and recommendation, treatment notes for these issues (except to the extent that they pertain to other issues) because this Court does not read Plaintiff's motion to rely upon Plaintiff's respiratory issues, digestive tract issues, and carpal tunnel syndrome as limiting Plaintiff's functional capacity.

[3] Plaintiff's treatment records use lupus, SLE, and lupus erythematosus interchangeably. This report and recommendation will use the acronym SLE unless quoting directly from the medical reports.

her pain, she had not had any difficulty continuing with activities of daily living and she was currently working fulltime as a bookkeeper. (Tr. 1196.)

In March 1998, Plaintiff again saw Dr. Meryhew and complained of depression and emotional lability. (Tr. 1048.) Dr. Meryhew concluded that plaintiff's SLE appeared to be clinically responding to her medication regimen. (Tr. 1048.) In May 1998, Plaintiff again saw Dr. Meryhew and complained of fatigue and lower extremity achiness. (Tr. 1044.) Dr. Meryhew concluded that Plaintiff was experiencing the recurrent symptoms of SLE. (Tr. 1044.)

In July 1998, Plaintiff saw Dr. Meryhew and complained of fatigue, forgetfulness, and pain. (Tr. 1042.) Plaintiff reported that she adjusted her work schedule to six hours per day and purchased a scooter for getting around. (Tr. 1042.) Dr. Meryhew concluded that Plaintiff's SLE was stable. (Tr. 1042.)

In October 1998, Plaintiff saw Dr. Meryhew and reported diffuse myalgia, nonrestorative sleep, and headaches. (Tr. 1041.) Dr. Meryhew concluded that many of Plaintiff's symptoms are consistent with fibromyalgia superimposed on SLE. (Tr. 1041.)

In January, April, June, August, and September of 1999, Dr. Meryhew noted that Plaintiff's SLE was relatively "stable" and "quiescent" (Tr. 1030, 1033, 1036, 1038-39.) In January 1999, Plaintiff reported that she had sixty percent good days and forty-percent bad days. (Tr. 1038.)

In November 1999, Plaintiff saw Dr. David Waletzko and reported that "overall [she was] doing fairly well with her lupus, maybe some occasional increased body aches." (Tr. 1028.) Dr. Waletzko concluded that Plaintiff's SLE was "well controlled." (Tr. 1028.) Dr. Meryhew concluded that Plaintiff's physical pain was in response to a temporary reduction in Plaintiff's prednisone dosage. (Tr. 1021.) In September 2000, Dr. Waletzko concluded that, based upon the

testing done, Plaintiff's SLE appeared to be in remission. (Tr. 1017.) Dr. Meryhew also described Plaintiff's SLE at this time as "relatively stable." (Tr. 1018.)

In April 1999, Plaintiff underwent gastric bypass, decompressive gastrostomy, cholecystectomy, and reduction of hiatal hernia. (Tr. 640, *see also* Tr. 656-61.) At the time of Plaintiff's surgery she was diagnosed with medically severe (morbid) obesity and steroid dependent fibromyalgia. (Tr. 1173.) Prior to her surgery it was noted that Plaintiff experienced shortness of breath with any physical activity, including climbing stairs and exercising. (Tr. 1177.) Following her surgery and as of March 2001, Plaintiff had lost 123 pounds and reported that she was very physically active and her energy level was high. (Tr. 651, *see also* Tr. 652-55, 685-92.)

In February 2001, Plaintiff saw Dr. Meryhew and reported that she had stiffness in her right foot, fatigue, and restless leg syndrome. (Tr. 1004.) Dr. Meryhew speculated that Plaintiff's pain was caused by her increased activity following her weight loss. (Tr. 1004.)

In March 2001, Plaintiff saw Dr. Meryhew and reported that she had lower extremity pain and fatigue. (Tr. 995.) Plaintiff also reported that she was under a lot of stress because, among other things, the business that she owned with her husband was not doing well and she was "anticipating new employment in the immediate future." (Tr. 995.) Dr. Meryhew noted that Plaintiff's SLE was "relatively stable." (Tr. 995.)

In September 2001, Plaintiff reported to Dr. Waletzko that her pain was five on a ten-point scale. (Tr. 960.) On October 25, 2001, Plaintiff saw Dr. Meryhew and reported that she had constant discomfort that waxed and waned throughout the day. (Tr. 955.) Dr. Meryhew noted that Plaintiff had some tenderness in her joints. (Tr. 955.) Dr. Meryhew diagnosed Plaintiff with SLE with gradually increasing pain and possibly fibromyalgia. (Tr. 955.)

On August 13, 2002, Plaintiff saw Dr. Waletzko and complained that her SLE pain was seven on a ten-point scale. (Tr. 933.) Plaintiff reported that the pain was mostly in her legs and that she had difficulty balancing for the previous six months. (Tr. 933.) Dr. Waletzko's exam was unremarkable and he diagnosed Plaintiff with SLE, extrapyramidal disease and abnormal movement disorder, chronic depression, and hypothyroidism. (Tr. 935.) Plaintiff's medications were as follows: Serzone, Vioxx, Glucosamine-Chondroitin, Mirapex, prednisone, Climara, Synthroid, Neurontin, diflucan, triamcinolone acetonide, Diflucan, Cipro, Prevacid, Indomethacin, and Kenalog. (Tr. 936-37.)

On October 1, 2002, Plaintiff saw Dr. Meryhew and complained of diffuse pain in her extremities, headaches, difficulty with her memory, and fatigue. (Tr. 931A.) Plaintiff reported that she was currently working two jobs—bookkeeping for her husband and working as a paralegal or legal assistant. (Tr. 931A.) Dr. Meryhew noted no edema, loss of range of motion, or swelling. (Tr. 931A.)

2.  Treatment Records from 2003

On January 27, 2003, Plaintiff called Dr. Waletzko from Florida to report that she would be in Florida from January 4, 2003, until February 14, 2003. (Tr. 905.) In April 2003, Plaintiff saw Dr. Daniel R. Baker and reported that "she ha[d] moved to a permanent vacation home in Northern Minnesota and ever winter spends 5 month in her travel bus touring the United States. (Tr. 310.)

In June 2003, Plaintiff underwent a surgery to remove redundant tissue following her significant weight loss. (Tr. 279-83, 888-92.) During Plaintiff's pre-operation physical examination, Plaintiff reported that she had headaches, which were controlled. (Tr. 284.) The examination revealed that Plaintiff had normal range of motion in her spine and extremities and

her muscular strength was intact. (Tr. 287.) Plaintiff's current medications were listed as Synthroid, Albuterol, Diflucan, Vioxx, Serzone, Flonase, Prednisone, Climara, and Mirapex. (Tr. 285.) After four days in the hospital, Plaintiff was discharged and instructed Plaintiff that she could be up as tolerated and should ambulate more. (Tr. 280.)

On July 2, 2003, Plaintiff saw Dr. Waletzko and complained of low back pain. (Tr. 444.) Dr. Waletzko noted that Plaintiff had excellent strength in her lower extremities. (Tr. 445.) Plaintiff was diagnosed with lumbago (or low back pain) and edema. (Tr. 445.)

On August 14, 2003, Plaintiff underwent a CMG/EMG testing, which showed no signs of upper or lower motor neuron injury. (Tr. 314-15.) On August 28, 2003, Plaintiff returned to Midsota Plastic Surgeons, P.A.

> for [a] recheck . . . because of concern about her left breast, which ha[d] seen injury a day or so ago when she was moving a large conference table, strapping it against the wall of a truck with a bungee cord, which snapped. The end of the cord apparently hit her in the left breast.

(Tr. 840.) No "worrisome irregularities" were found upon examination. (Tr. 840.)

On September 30, 2003, Plaintiff saw Dr. Kathleen Lundell. (Tr. 299-304, 811-17.) Plaintiff reported that she owned two businesses. (Tr. 301.) Plaintiff also reported that she had restless leg syndrome, chronic headaches and migraines, occasional loss of balance, occasional weak grip, labile emotions and difficulty dealing with stress, and her symptoms were worsened by exertion. (Tr. 302.) Dr. Lundell diagnosed Plaintiff with SLE, fatigue, depression, hypothyroidism, fibromyalgia, migraines, and chronic back pain. (Tr. 303.) Plaintiff's current medications were Neurontin, Synthroid, Serzone, Estradiol, Mirapex, Prednisone, Vioxx, Hydrochlorothiazide, Diflucan, Trimethoprim, Flonase, Albuterol, and Prevacid. (Tr. 300.)

On October 13, 2003, Plaintiff saw Dr. Lundell for treatment of her SLE. (Tr. 297, 807.) Plaintiff reported that she felt tired, had intermittent migraine headaches, felt depressed, had chronic back pain (with generalized arthralgia and myalgias), occasional tingling in her feet, low extremity edema, short-term memory loss, and dizziness. (Tr. 297.) Dr. Lundell identified no edema and found Plaintiff's motor strength to be 4/5. (Tr. 297.) Dr. Lundell reduced Plaintiff's medications and instructed Plaintiff to do aerobic exercise. (Tr. 298.)

On November 23, 2003, Plaintiff had a follow-up appointment for some cosmetic surgery. (Tr. 837.) Plaintiff reported that she and her husband opened up a fireplace store in Brooklyn Park and that she was planned to spend the winter in Florida. (Tr. 837.)

In early December 2003, Plaintiff saw Dr. Lundell for the treatment of her SLE. (Tr. 290, 293, 800, 803.) Plaintiff reported that her SLE caused her to feel fatigued and she typically needed to nap in the afternoons. (Tr. 290.) Plaintiff also reported that she had arthralgia, myalgias, nose sores, and a rash. (Tr. 290, 293, 297.) Plaintiff also reported that she experienced nausea, poor appetite, discomfort in her scapula and legs, chills, numbness in her feet, and edema in her lower extremities. (Tr. 291.) Dr. Lundell noted that Plaintiff's bone density was within normal limits, but less than it was in 1999. (Tr. 290.) Dr. Lundell diagnosed Plaintiff with SLE, fatigue, hypothyroidism, depression, fibromyalgia, restless leg syndrome, migraines, chronic back pain, and nausea. (Tr. 291, 294.) Dr. Lundell noted that overall Plaintiff "remain[ed] stable." (Tr. 800.)

On December 10, 2003, Plaintiff saw Dr. John L. Graner. (Tr. 402.) Plaintiff reported that she had leg pain, chronic tiredness, and headaches. (Tr. 402.) Plaintiff also reported that she got relief from her antidepressant. (Tr. 402.) Dr. Graner noted that Plaintiff had trigger points

positive for fibromyalgia in her back, but she had no signs of inflammatory joint disease. (Tr. 403.)

On December 17, 2003, Plaintiff saw Dr. Joseph Y. Matsumoto. (Tr. 395.) Plaintiff reported that she had frequent headaches for the past six months. (Tr. 395.) Plaintiff's neurological examination revealed no abnormalities. (Tr. 396.) Plaintiff was diagnosed with common migraine headaches and restless leg syndrome that was controlled with Mirapex. (Tr. 387, 396.) On December 17, 2003, Plaintiff also saw Dr. Clement J. Michet. (Tr. 397.) Plaintiff reported that she had pain and stiffness in her back, and her knees bothered her when climbing stairs. (Tr. 397.) The only abnormality Dr. Michet could identify was that Plaintiff had slightly low calcium. (Tr. 397.) Dr. Michet noted that Plaintiff had some tenderness in her rotator cuff, but her passive range of motion in her hips was painless and normal, her gait and stance were normal, and she had no proximal muscle weakness. (Tr. 397.)

On December 18, 2003, Plaintiff reported to the Fibromyalgia Treatment Program. (Tr. 393.) Plaintiff reported that she had fatigue, poor sleep quality, and pain in her leg, hand, and back. (Tr. 393.) Plaintiff also reported headaches, blurred vision, tinnitus, vertigo, lightheadedness, sense of imbalance, palpitations, night sweats, numbness, tingling, joint swelling, stiffness, muscle spasms, restless legs, cold intolerance, short-term memory impairment, decreased ability to concentrate, anxiety, crying spells, and depressed mood. (Tr. 393, 399-401.) Plaintiff stated that her symptoms were aggravated by repetitive motion, prolonged sitting, prolonged standing, stress, weather changes, and climbing stairs. (Tr. 393.)

On December 22, 2003, Plaintiff saw Dr. Graner. (Tr. 390.) Dr. Graner noted that Plaintiff had no evidence of spondylorathropy. (Tr. 391.) On December 22, 2003, Plaintiff underwent an overnight oximetry, which revealed normal baseline and mean saturation, with a

mild degree of oscillatory variation. (Tr. 376.) On December 24, 2003, Plaintiff saw Dr. Warren C. Ketterling. (Tr. 381.) Dr. Ketterling concluded that Plaintiff did not have obstructive sleep apnea. (Tr. 381.) Dr. Ketterling summarized Plaintiff diagnoses as follows: fibromyalgia, chronic fatigue and somnolence, chronic foot pain, hypocalcemia, and chronic depression. (Tr. 381.)

On December 24, 2003, Plaintiff also saw Dr. Ada R. Igwebuike, who observed that Plaintiff's gait was normal. (Tr. 383-84.) Dr. Igwebuike diagnosed Plaintiff with hypocalcemia and lower total protein. (Tr. 385, 386.)

On December 30, 2003, Plaintiff saw Dr. Donald E. McAlpine. (Tr. 373.) Plaintiff reported that her mood was "okay," she felt more wound up and indecisive, had excess fatigue and tiredness, and a lack of concentration. (Tr. 373.) Plaintiff reported that she was going to spend the winter in Florida. (Tr. 374.) Dr. McAlpine noted that Plaintiff had a score of 10 on her Beck depression inventory, which is in the mild range. (Tr. 373.) Dr. McAlpine also noted that Plaintiff took several medications that had sedative side-effects. (Tr. 373.) Dr. McAlpine also noted that Plaintiff's "lupus-like problem [was] fairly quiescent presently." (Tr. 373.) Dr. McAlpine noted that Plaintiff had normal thought content, cognition, attention/concentration, reasoning, and judgment. (Tr. 374.) Dr. McAlpine diagnosed Plaintiff with major depression that was recurrent and in partial remission, restless leg syndrome, and pain disorder. (Tr. 374.)

On December 30, 2003, Plaintiff saw Dr. Graner. (Tr. 377.) Dr. Graner noted that while Plaintiff had a diagnosis of SLE, her erythrocyte sedimentation rate was normal and he concluded that she should discontinue her steroid. (Tr. 377.) On December 30, 2003, Plaintiff also saw Dr. Steven J. Kavros, who concluded that Plaintiff's foot pain was caused by tight fitting shoes. (Tr. 379.)

### 3. Treatment Records from 2004

On January 6, 2004, Plaintiff saw Dr. Waletzko. (Tr. 438.) Plaintiff reported that she continued to have restless leg symptoms; she noted that her symptoms improved if she was active, but she had a hard time being active. (Tr. 438.) Dr. Waletzko noted that Plaintiff had slight lower leg symmetrical edema. (Tr. 438.)

On April 1, 2004, Plaintiff underwent an MRI, which revealed "[m]ild to moderate multilevel lower thoracic and lumbar disc degeneration, with mild thoracolumbar Scheuemann's like changes, and normal sagittal alignment of the lumbar vertebrae. (Tr. 454, 495-96, 513-14.) On April 5, 2004, Plaintiff saw Dr. Peter D. Holmberg and complained of lower back and left leg pain. (Tr. 450.) Dr. Holmberg concluded that Plaintiff had low back pain and her MRI showed "a very small disc herniation." (Tr. 450, 452.) Plaintiff was given an epidural. (Tr. 450-51.) On April 23, 2004, Plaintiff reported to Dr. Holmberg that 75 percent of her pain was gone. (Tr. 449.) Dr. Holmberg concluded that Plaintiff was doing "quite well." (Tr. 449.)

In April 2004, Plaintiff saw Dr. Jarrett W. Richardson to review her concerns about nonrestorative sleep and daytime sleepiness. (Tr. 365.) Dr. Richardson noted that Plaintiff endorsed a high level of stress, and that she and her husband run two businesses. (Tr. 366.) Dr. Richardson noted that Plaintiff had a normal orientation, mood, memory, gait and range of motion, but she walked stiffly due to her back pain. (Tr. 367.) Dr. Richardson diagnosed Plaintiff with restless leg syndrome, obstructive sleep apnea, and hypersomnia. (Tr. 364, 367; *see also* Tr. 368-71.) Dr. Richardson noted that Plaintiff was on many medications that could account for her daytime sleepiness. (Tr. 367.) Dr. Richardson prescribed a one month trial of a nasal continuous positive airway pressure (CPAP) machine. (Tr. 363.)

In May 2004, Plaintiff reported that she spent four months in Florida that year. (Tr. 796.) In July 2004, Plaintiff underwent an MRI, which revealed that Plaintiff had marked degenerative disc disease at C6-7 and mild posterior marginal spurring, mild posterior disc bulging at C4-5, and no evidence of acute disc herniation or significant spinal stenosis. (Tr. 511, 846-47.)

On September 15, 2004, Plaintiff went in for her five-year-follow-up examination for her gastric-bypass surgery. (Tr. 683.) Plaintiff reported that she had moved to a permanent vacation home in Northern Minnesota and spent five months in her traveling bus touring the United States. (Tr. 683.) The examination was unremarkable except for the fact that she had some fluid retention in her legs. (Tr. 683.)

On September 27, 2004, Plaintiff completed a medical examination for a commercial driver fitness determination. (Tr. 430.) Plaintiff's conditions were identified as SLE, a sleep disorder, and a herniated disc. (Tr. 430.) Plaintiff was listed as not having nervous or psychiatric disorders. (Tr. 431.) Dr. Christine K. Yo approved Plaintiff for a 2 year certification. (Tr. 431.)

On November 19, 2004, Plaintiff had some sutures after she lacerated her thumb "while putting up some wallpaper." (Tr. 474; *see also* Tr. 575.)

In early December 2004, Plaintiff had surgery on her foot. (Tr. 470, 473; *see also* Tr. 579.) Plaintiff reported that she lived in Deerwood for the summers and lived in Florida during the winter. (Tr. 471.) Following surgery Plaintiff was instructed to not do excessive walking. (Tr. 576.)

On December 17, 2004, Plaintiff saw Dr. Mark Harold Winemiller. (Tr. 360.) Plaintiff reported increased lower back pain and widespread myalgias. (Tr. 360.) Plaintiff denied weakness, hip girdle pain, gait unsteadiness, radiating pain to foot or leg. (Tr. 360.) Dr. Winemiller noted that Plaintiff's cognition was grossly intact, all major muscle groups have

13

normal muscle strength, bulk, and tone. (Tr. 361.) Dr. Winemiller further noted that Plaintiff's joint range of motion was full and pain free. (Tr. 361.) Dr. Winemiller diagnosed Plaintiff with mechanical lower back pain, likely due to degenerative spondylosis (Tr. 361.) Plaintiff was prescribed physical therapy. (Tr. 361.)

On December 21, 2004, Plaintiff was seen in the emergency department following two months of abdominal discomfort, nausea, and "dry heaves." (Tr. 305.) Plaintiff was admitted to the hospital with a diagnosis of a possible bowel obstruction. (Tr. 306, *see also* Tr. 463-66; *see also* n.2.) An examination of Plaintiff on December 21, 2004, showed that Plaintiff had pitting edema bilaterally, with strength and sensation grossly within normal limits in her upper and lower extremities. (Tr. 330.) On December 22, 2004, Plaintiff was seen for a gastroenterology consultation. (Tr. 332.) Plaintiff reported that she was a homemaker, and she and her husband recently retired. (Tr. 333.) Plaintiff was diagnosed with a common bile duct obstruction. (Tr. 328, 336, 485, 487, 491.)  Plaintiff was discharged on December 24, 2004. (Tr. 328.)

On December 29, 2004, Plaintiff saw Valerie L. Jackson, P.A.-C. (Tr. 356.) Ms. Jackson noted that Plaintiff ambulated without difficulty. (Tr. 356.)

4.  Treatment Records from 2005

On January 4, 2005, Plaintiff saw Dr. Qahtan A. Abdul Fattah for her headaches. (Tr. 345.) Plaintiff reported that she was going to Florida to spend the winter. (Tr. 346.) Plaintiff also reported she had two headaches per week. (Tr. 345.) Plaintiff's neurologic examination was unremarkable except for mild increased reflexes in the quadriceps femoris tendons. (Tr. 349.) Plaintiff was prescribed Micromedex. (Tr. 346.)

On January 7, 2005, Plaintiff saw Dr. Charles A. Russell for follow up to a surgery on her foot. (Tr. 574; *see also* Tr. 481 646.) Dr. Russell instructed Plaintiff to avoid excessive walking

for two or three weeks then engage in her normal activities to the extent that she could tolerate them. (Tr. 574.)  On January 7, 2005, also saw Dr. George A. Kuhlmann. (Tr. 573.) Plaintiff reported that she had pain with eating and difficulty eating. (Tr. 573.) On January 10, 2005, Plaintiff again saw Dr. Severson. (Tr. 572.) Plaintiff reported that she had no more abdominal pain and would like to leave to spend the winter in Florida. (Tr. 572.) Dr. Severson noted that Plaintiff had a diagnosis of choledocholithiasis. (Tr. 572.)

On January 27, 2005, Dr. Graner completed the following report. Dr. Graner first noted that he "made several attempts to get [Plaintiff] back for a return visit . . . to no avail." (Tr. 341.) Dr. Graner concluded as follows: Plaintiff's restless leg syndrome was doing well on her medication and CPAP machine, which has improved her fibromyalgia symptomatology. (Tr. 341.) Plaintiff's fibromyalgia was primarily lower back pain and Plaintiff was prescribed an exercise regimen. (Tr. 341.) Plaintiff's diagnoses were listed as follows: restless leg syndrome and mild OSA, fibromyalgia, migraine headaches, and treated hypothyroidism. (Tr. 342.)

On June 6, 2005, Plaintiff saw Dr. Qahtan A. Abdul Fattah. (Tr. 340.) Plaintiff reported that her headaches were under very good control and she only had migraines once per month. (Tr. 340.) Dr. Abdul Fattah reported that Plaintiff had sleep apnea and was not using her CPAP machine frequently. (Tr. 340.) Plaintiff reported no drowsiness. (Tr. 340.)

On June 17, 2005, Plaintiff saw Dr. Krisa K. Christian. (Tr. 567.) Plaintiff complained of lack of energy and fatigue. (Tr. 567.) Dr. Christian diagnosed Plaintiff with SLE, but questioned whether it was still active. (Tr. 568.) On June 24, 2005, Plaintiff contacted Dr. Christian and complained of worsening pain in her upper extremities and legs. (Tr. 566.) Plaintiff was prescribed Prednisone. (Tr. 566.)

On June 28, 2005, Plaintiff completed a form for receiving chiropractic care. (Tr. 417.) Plaintiff listed her conditions as "ongoing chronic back pain" that was worsened by standing, bending, and riding in a car extended periods of time. (Tr. 418.)

On July 11, 2005, Plaintiff underwent an MRI, which revealed as follows:

1.  Evidence of a small, caudally extruded, left posterolateral disc herniation at L5-S1 with moderate to advanced disc degeneration and no neural impingement. The disc herniation is not visualized well on axial sections possibly secondary to positioning of the axial images. . . .

2.  Moderate disc degeneration at both L4-5 and L3-4 with diffuse posterior bulging of the disc annulus at each level and no significant narrowing of the central canal.

3.  Multilevel foraminal stenosis. This is a moderate bilaterally at L5-S1, moderate bilaterally at L4-5, and mild bilaterally at L3-4 with mild ganglionic impingement at the L5-S1 level.

4.  Comparison with the previous MRI of 4/01/04 shows progressive degeneration of L5-S1. L4-5, and L3-4 discs. A moderate sized caudally extruded disc herniation was noted on the left at L5-S1 on the previous exam. The disc herniation on the current exam is smaller and may represent either residual or recurrent disease. Foraminal stenosis at L5-S1 and L4-5 has increased in severity in the interval and a high signal annular tear previously noted at L4-5 is no longer seen.

(Tr. 509, 478-79, 508-09.) Her disc herniation was characterized as a "very small left ventral disc herniation causing a few millimeter dorsal displacement of [the] left . . . nerve root" nad foramina stenosis was characterized as "moderately severe." (Tr. 452, 510.)

On July 11, 2005, Plaintiff saw Dr. Holmberg for evaluation of her lower back. (Tr. 448.) Dr. Holmberg noted that Plaintiff had limitation of motion in her lumbar spine. (Tr. 448.) Dr. Holmberg diagnosed Plaintiff with intermittent left leg radiculitis and herniated disc in her

lumbar spine as a result of degenerative disc disease. (Tr. 448.) Dr. Holmberg recommended that Plaintiff undergo physical therapy.[4] (Tr. 448.)

On July 15, 2005, Plaintiff saw Dr. Ana Fernandez and reported that she had no energy, severe back pain, severe fatigue, "pain all over," tingling in her extremities if she used them, restless legs, and an inability to walk. (Tr. 422.) Plaintiff reported that her back pain was worsened by sitting, standing, and bending. (Tr. 422.) Dr. Fernandez observed that Plaintiff looked uncomfortable, was in a depressed mood, and became tearful during this discussion. (Tr. 423.) Dr. Fernandez further observed that Plaintiff "[c]omplain[ed] of achiness overall, although she [was] not really withdrawing or grimacing to palpitation over the trigger points." (Tr. 423.) Dr. Fernandez diagnosed Plaintiff with SLE and myofascial pain with lack of restful sleep consistent with fibromyalgia, obesity, and depression. (Tr. 423-24.)

On July 25, 2005, Plaintiff saw Dr. Holmberg regarding her low back pain. (Tr. 447.) Dr. Holmberg noted some limitation in her range of motion in her lumbar spine, but her "[l]ower extremities show[ed] normal motion, normal stability, normal sensation, normal circulation, normal strength, normal reflexes, normal pulses, and normal skin exam." (Tr. 447.) Dr. Holmberg noted that Plaintiff's MRI revealed a "very small left ventral disc herniation" and a "severe right neural foraminal stenosis."[5] (Tr. 447.)

---

[4] On July 13, 2005, Plaintiff attended physical therapy. (Tr. 458.) Plaintiff reported that she had low back and buttocks pain. (Tr. 458.)

[5] At Plaintiff's request, Dr. Holmberg prescribed physical therapy "one more time but that [was] all." (Tr. 447.) Plaintiff request Dr. Holmberg fill out a report in support of her application for Social Security Disability and he "told her that this is something that [he] would not do." (Tr. 447.) On July 28, 2005, Plaintiff saw Howard E. Johnson, D.C. (Tr. 505.) He noted that Plaintiff was very upset with Dr. Holmberg and was crying with pain. (Tr. 505.)

Plaintiff completed a patient questionnaire on July 26, 2005. (Tr. 507.) Plaintiff reported as follows: Her pain was very severe. (Tr. 507.) Her sleep had been reduced by 75 percent. (Tr. 507.) Her pain prevented her from sitting more than one half hour. (Tr. 507.) Her pain prevented her from standing more than ten minutes. (Tr. 507.) Her pain made it so that she could not walk without pain. (Tr. 507.) Her pain prevented her from "lifting heavy weights." (Tr. 507.) She did not need to seek alternate forms of travel. (Tr. 507.) Her pain had restricted her social life and she did not go out very often. (Tr. 507.) Her pain was rapidly worsening. (Tr. 507.)

On August 19, 2005, Plaintiff was examined by Dr. Edward G. Hames III. (Tr. 643.) Her medications were listed as Synthroid, Allegra, Mirapex, Neurontin, Diflucan, Topamax, Prednisone, Maxalt, Albuterol, Flonase, and Lexapro. (Tr. 642.) Dr. Hames observed that Plaintiff had the "stigmata of a chronic pain problem." (Tr. 643.) Dr. Hames also observed Plaintiff had no low back cutaneous anomalies, but she did have substantially reduced range of motion. (Tr. 643.) On August 25, 2005, Plaintiff followed up with Dr. Kuhlmann, who reviewed Dr. Hames report, noted Plaintiff continued to have low back pain without significant radiation, and prescribed pain medication. (Tr. 564.)

On September 8, 2005, Plaintiff saw Dr. Thomas J. Balfanz, and complained of low back pain; upper extremity pain, paresthesias, and weakness; lower extremity pain; headaches; and weakness in her hands for many years. (Tr. 517.) Plaintiff stated that her symptoms substantially impacted her life because the pain was continuous, worsened in bed, worsened with increasing activity, worsened by prolonged standing, worsened by prolonged sitting, worsened by prolonged walking, bending, and lifting, and caused her restless sleep. (Tr. 517.) Plaintiff also reported that she did not feel that she would be able to work in the future. (Tr. 517.) She could

not drive a semi-truck because of the extended sitting. (Tr. 519.) Plaintiff reported that she could not work at a desk because it would tend to increase her elbow symptoms. (Tr. 519.)

Dr. Balfanz observed that in her cervical spine, Plaintiff's active forward flexion was mildly impaired and her active extension was moderately impaired. (Tr. 519.) In her lumbosacral spine, Plaintiff's active range of motion in flexion was 45 degrees on a scale of 90 degrees. (Tr. 520.) In addition, her active range of motion in extension was markedly impaired. (Tr. 520.) Dr. Balfanz noted that Plaintiff was alert and oriented; her mood and affect were normal; her recent and remote memory was intact; her attention span and concentration were intact; and her extremity strength was 4 on a 5-point scale. (Tr. 520.) Dr. Balfanz diagnosed Plaintiff with chronic pain syndrome, fibromyalgia, low back pain, deconditioning syndrome, and SLE. (Tr. 521.) Dr. Balfanz referred Plaintiff to a chronic pain program and suggested that she join a swimming pool. (Tr. 521.)

In October 2005, Plaintiff saw Dr. Stephen L. Hadley. (Tr. 561.) Plaintiff described her pain symptoms as "aching all over" and stated that she was concerned about her inability to hold a job. (Tr. 559.) Plaintiff reported fatigue, weakness, fevers, dizziness, numbness, memory loss, shooting pains, poor sleep, easy bruising, and possible Raynaud's phenomenon. (Tr. 560.) Dr. Hadley noted that Plaintiff ambulated with difficulty and appeared uncomfortable throughout the examination. (Tr. 560.) Dr. Hadley noted neither edema in her extremities nor evidence of joint problems. (Tr. 560.) Dr. Hadley further noted that Plaintiff had 16 of 18 trigger points for fibromyalgia. (Tr. 560.) Dr. Hadley diagnosed Plaintiff with fibromyalgia, severe chronic pain syndrome, and chronic low back pain. (Tr. 560.) Dr. Hadley noted that there was "no clinical evidence" of SLE. (Tr. 561.)

In December 2005, Plaintiff saw Dr. Kuhlmann. (Tr. 557.) Plaintiff reported that she would be going to Florida. (Tr. 557.) Therefore, Dr. Kuhlmann adjusted Plaintiff prescriptions so that Plaintiff could manage her medication dosages "depending on how much pain she is having and whether she is going to be driving or active." (Tr. 557.)

### 5.   Treatment Records from 2006

On May 16, 2007, Dr. Stephen Hadley informed Plaintiff that the laboratory tests used to assess the activity of her SLE came back negative for SLE markers. (Tr. 778.) Dr. Hadley concluded that Plaintiff's current symptoms were not related to active SLE. (Tr. 778.)

In June 2006, Plaintiff underwent motor nerve conduction studies on both arms. (Tr. 730-31.) The studies showed normal results, except for mildly prolonged distal sensory latencies for the right and left, and slightly reduced right median sensory amplitude. (Tr. 731.) On June 27, 2006, Plaintiff underwent an ultrasound of her lower extremities, which revealed no evidence of deep vein thrombosis. (Tr. 671.)

In July 2006, Plaintiff was admitted to the hospital for abdominal pain, nausea, migraines, and recurrent diarrhea. (Tr. 663, 694-97.) It was noted that Plaintiff had no edema and full strength in her extremities. (Tr. 695.) Plaintiff was subsequently discharged. (Tr. 695.)

In August 2006, Plaintiff saw Dr. Daniel E. Wallerstein and described pain in her mid thoracic, lumbar, and hip girdle regions, including her coccyx. (Tr. 733.) She also complained of paresthesias in both legs. (Tr. 733.) Plaintiff reported that her symptoms kept her awake at night and were worse when she awoke, sat, stood, laid down, and walked. (Tr. 733.) Finally, Plaintiff reported that she felt exhausted all of the time and "it [took] her all day to do activities around the house." (Tr. 733.) Dr. Wallerstein noted Plaintiff moved "very slowly" when standing and

walking, and he had some limited mobility in her back. (Tr. 734.) Dr. Wallerstein examined

Plaintiff and observed as follows:

> On gentle palpation she complains of tenderness in the paraspinal
> muscles of the mid thoracic area. Mild tenderness with lumbar
> paraspinals, especially on the right where pressure here partially
> reproduces her symptoms. She is exquisitely tender with palpation
> over bilateral greater trochanters, definitely worse on the left. She
> later shares that she does not tolerate lying on her left side in bed
> because of her lateral hip pain. She tends to sit with partially
> rounded posture and head forward. Lumbar forward bending
> initially self limited at about 45 to 50 degrees but with coaching to
> flex at the hips instead of back she was able to forward bend to
> about 80 degrees. Schober's test is positive at 3.5 cm indicating
> limited lumbar segmental mobility. This caused tightness at the
> lumbosacral junction and also in bilateral hamstrings. Lateral trunk
> excursion is quite limited . . . .

(Tr. 734.) He also noted that Plaintiff's hip range of motion was normal and Plaintiff did "not

appear to have any motor deficits." (Tr. 734.) Dr. Wallerstein diagnosed Plaintiff with chronic

pain syndrome, "limited postural awareness and conditioning attributing to thoracic and lumbar

strain pattern," chronic coccydynia, multilevel degenerative disk changes, and depression. (Tr.

734.) Plaintiff's medications were listed as Clonazepam, Prochlorperazine, Fluoxetine, Diflucan,

Flomax, Hydrocodone, Maxalt MLT, Mirapex, Gabapentin, Prevacid, Relpax, Synthroid,

Topamax, Trimethoprim, Ursodiol, Estradiol, inhaler medicine, Albuterol Sulfate and Allegra-D,

Lortab liquid, Diaudid, and Lorazepam. (Tr. 733.)

In September 2006, Plaintiff saw Dr. Wallerstein again and complained of

sacrococcygeal pain that was exacerbated by sitting and other activities. (Tr. 732.) Dr.

Wallerstein diagnosed Plaintiff with periosteal irritation. (Tr. 732.)

6.   Treatment Records from 2007

In February 2007, Plaintiff saw Dr. Bradley J. Qualey. (Tr. 627.) Plaintiff reported that

she could not sleep on her back and she was nauseated by the pain medication. (Tr. 627.)

On April 5, 2007, saw Dr. J. A. Zamzow to follow up on her coccygectomy. (Tr. 703; *see also* 705-08.) Dr. Zamzow noted that Plaintiff was doing quite well and she appeared to have improved in her ability to sit and descend stairs. (Tr. 703.) Plaintiff complained of restricted range of motion in her left shoulder. (Tr. 703.) Dr. Zamzow thought that Plaintiff had impingement syndrome and Plaintiff received a shoulder injection. (Tr. 702-03.)

On May 17, 2007, Plaintiff saw Dr. Stephen Hadley and reported that, although her coccyx pain had improved, she had a significant increase in her fatigue. (Tr. 780.) Plaintiff reported that she slept up to 36 hours at a time and she had poor sleep quality. (Tr. 780.) Dr. Hadley recommended some changes to Plaintiff's medication regimen and Plaintiff "insist[ed] that she [was] not overly sedated with her current pharmacopeia." (Tr. 780.) Plaintiff reported that she exercised at least three days a week by talking a long walk with her dog. (Tr. 780.) Plaintiff was prescribed Flexeril and VESIcare. (Tr. 780.)

### ii.  Treatment Records from Counseling[6]

Plaintiff sought individual counseling treatment from 1998 through 2001 from Fairview Counseling Services. (Tr. 745-75.) In October 2001, Plaintiff was discharged from counseling with a diagnosis of moderate, single episode major depressive disorder. (Tr. 745.) Plaintiff was discharged because she had reduced her depression symptoms and met her goals. (Tr. 745.) Most of Plaintiff's counseling notes concern family stressors and Plaintiff's goals.

From 2001 through 2003, Plaintiff and her husband sought counseling services from Pathways Psychological Services. (Tr. 237-77.) In December 2001, Plaintiff's counselor

---

[6] Many of the notes from the sessions are handwritten and include abbreviations unique to the counselor. Therefore, the notes are, in some sections, difficult to read and decipher.

completed a treatment plan for Plaintiff. (Tr. 271.) Much of the document is illegible. (Tr. 271.)
Plaintiff's GAF score was 63.[7] (Tr. 271.)

The majority of the counseling notes from 2001 to 2003 concern marital and familial
conflicts that are not relevant to her application for DIB. Plaintiff also frequently discussed job
difficulties.  On January 18, 2002, Plaintiff reported that she quit her job. (Tr. 264.) Plaintiff
wanted to delay her job search so that she could spend some time focusing on her health
concerns—namely SLE. (Tr. 264.) Plaintiff said that eventually she wanted to find another job.
(Tr. 264.) On January 22, 2002, Plaintiff reported that she disliked the politics associated with
the job that she recently quit. (Tr. 263.) Plaintiff reported that she was torn between school and
finding another job. (Tr. 263.) On June 25, 2002, Plaintiff reported that she was nervous about
her law firm job and told her boss that she did not know if she would be able to do the job. (T4.
244.) On August 12, 2002, Plaintiff reported that her work at the landfill business was going well
and was "coming together for [her]." (Tr. 242.) On November 5, 2002, Plaintiff reported that she
did not feel like she belonged at her job anymore. (Tr. 239.)

### d.  Record from Plaintiff's Application for DIB

#### i.  Interviews

Plaintiff conducted a face-to-face disability report interview on July 29, 2005. (Tr. 94-
96.) The interviewer observed that Plaintiff had difficulty concentrating, talking, sitting,

---

[7] A Global Assessment of Functioning (GAF) score between 41 and 50 constitutes a
"Serious symptoms (e.g., suicidal ideation . . . ) OR any serious impairment in social
occupational, or school functioning (e.g., no friends, *unable to keep a job*)."  American
Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, at 34
(4th ed. Text Revision 2000) (emphasis added). A GAF score between 51 and 60 constitutes
"moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning
(e.g., few friends, conflicts with peers and co-workers). *Id.*

standing, and walking. (Tr. 95.) The interviewer reported that sometimes Plaintiff could

concentrate and sometimes would ramble off the current question. (Tr. 96.)

### ii.   Plaintiff's Self-Description

In December 2005, Plaintiff completed a disability report. (Tr. 155.) Plaintiff reported as

follows: Her level of pain and memory problems had increased. (Tr. 155.) On some days she had

difficulty taking care of her personal needs. (Tr. 159.)

Plaintiff completed another disability report in March 2006. (Tr. 179-86.)   Plaintiff

reported that since her last disability report she had new conditions, including persistent nausea

and difficulty sleeping. (Tr. 179-86.) Plaintiff also reported that she had difficulty putting on

shirts, writing, carrying on a conversation, and gripping and holding items. (Tr. 183-84.)

On October 30, 2006, Plaintiff completed another disability report. (Tr. 97-112.) Plaintiff

reported as follows: She had SLE, degenerative disc disease, herniations, fibromyalasia, asthma,

and Rhynauds syndrome, restless leg syndrome, depression, vertebral subluxation, bone spurs,

bile duct complications, and chronic fatigue. (Tr. 97.) She could not sit, stand, lean, lift, drive,

sleep, or remember words. (Tr. 98.) She cried all of the time. (Tr. 98.)

### iii.   Letters and Statements in Support of Plaintiff's Application

On August 7, 2005, Plaintiff's chiropractor, Howard E. Johnson, D.C. wrote a letter in

support of Plaintiff's application for DIB. (Tr. 502-04.) Mr. Johnson noted that until February

2004,[8] Plaintiff's pain was manageable. (Tr. 502.) Mr. Johnson noted that since 2004, Plaintiff's

---

[8] Mr. Johnson also reported that Plaintiff had been working on regular basis until 2004.
(Tr. 503.) Mr. Johnson stated: "Up to that time she had worked for her husband or for other
family businesses. . . . Since that time her husband has sold his business, other family
business[es] have also changed hands and she has essentially not worked with any regularity."
(Tr. 503.)

back pain had been intense and it radiated down her left leg. (Tr. 502.) Mr. Johnson concluded that Plaintiff's ability to function was greatly impaired by her pain. (Tr. 503.)

On September 20, 2005, Dr. Balfanz wrote a letter in support of Plaintiff's application for DIB. (Tr. 516.) He stated that he felt "that work [was] going to be very difficult for her as in her condition she [would] have pain on a daily basis which is quite distracting, and [he felt] that it is safe to say that she will miss more than three days of work per month due to flare-ups of her condition." (Tr. 516.)

On January 17, 2006, a mental health clinician completed a Psychological Medical Report in support of Plaintiff's application for DIB. (Tr. 605.) The clinician noted that Plaintiff's depression was mild to moderate, and Plaintiff would not be depressed if her physical problems were resolved. (Tr. 605.) The clinician noted some loss of interest and motivation due to pain. (Tr. 605.) The clinician noted that Plaintiff could get along and communicate well with people. (Tr. 605.) The clinician noted that Plaintiff could remember and carry out instructions and could respond appropriately to work pressure. (Tr. 606.) The clinician noted that Plaintiff did not exhibit any symptoms of physical limitations when she can in for appointments. (Tr. 606.)

On January 24, 2006, Stacy Sjoberg, M.D., Ph.D. wrote a letter, stating Plaintiff did not have a visual impairment that would interfere with her ability to do work related activities. (Tr. 600.)

In 2006, Dr. George A. Kuhlmann completed a medical statement in support of Plaintiff's application for DIB. (Tr. 621; *see also* Tr. 721-23.) He concluded that Plaintiff could lift five pounds occasionally; could never lift anything frequently; could stand less than two hours in an eight-hour day; could sit less than two hours in an eight-hour day; could not repetitively use her extremities; could not work at a regular work pace; must frequently change her position; would

have difficulty staying at a work station; had fatigue or pain that prevents her from sustaining her concentration; and would miss more than two days for work per month. (Tr. 623.)

In May 2007, Dr. Kuhlmann also completed a second a medical statement. (Tr. 1219.) In the statement, Dr. Kuhlmann listed Plaintiff's conditions as fibromyalgia, lumbar disc disease, neuropathy, and SLE. (Tr. 1219.) Dr. Kuhlmann's conclusions were identical to his earlier conclusion.

In November 2007, Dr. J.A. Zamzow completed a medical statement on behalf Plaintiff's DIB application. (Tr. 1247). Dr. Zamzow listed Plaintiff's conditions as: degenerative joint disease in her knees, coccydynia, and foot "mal-alignment." (Tr. 1247.) Dr. Zamzow concluded as follows: Plaintiff could not maintain full-time work. (Tr. 1247.) Plaintiff's limitations and conditions reasonably existed for some time prior to his treatment of Plaintiff. (Tr. 1247.) Plaintiff became disabled in approximately 2004. (Tr. 1247.) Plaintiff could occasionally lift ten pounds. (Tr. 1248.) The remainders of Dr. Zamzow's conclusions are consistent with Dr. Kuhlmann's conclusions.

### iv.  Function Reports

Plaintiff completed a function report in August 7, 2005. (Tr. 131.) Plaintiff reported about her daily activities as follows: In the typical day she "start[ed] out slow, until [her] back loosen[ed] up." (Tr. 131.) She took her dog out, showered, attended medical appointments, tended for her plants, cleaned up her home (i.e., swept, and washed and dried clothing), took a nap, and made a frozen dinner. (Tr. 131-32.) It took her about an hour to complete a meal. (Tr. 133.) She shopped for groceries. (Tr. 134.) She was able to handle money and finances. (Tr. 134-35.) Her hobbies included reading sewing, water sports, fishing, gardening, and boating. (Tr.

135.) She spent time with others once per month when her friend took her shopping and sometimes her children came to visit. (Tr. 135.)

Plaintiff reported about her conditions as follows: Prior to the onset of her conditions, she thought clearly, made decisions without feeling stressed, could walk miles, carried on an intelligent conversation, and could bend, lift, sit, and stand. (Tr. 132.) Since the onset of her conditions, she noticed she had difficulty in the following areas: squatting, bending, reaching, sitting, climbing stairs, sleeping, completing household chores, engaging in hobbies, concentrating, and handling stress.  (Tr. 132-37.) Plaintiff reported that she used a wheelchair and scooter. (Tr. 137.)

In August 2005, Plaintiff's husband also completed a function report. (Tr. 139-46.) His function report is consistent with Plaintiff's function report. Of note, her husband reported that Plaintiff worked on embroidery and crafts daily, and fished and played games once per week. (Tr. 143.)

In January 2006, Plaintiff completed an updated function report. (Tr. 171.) The second function report is similar to the first functional report with the following notable exceptions: She slept more. (Tr. 171-72.) She "[could not] do as much mowing due to [her] back." (Tr. 173.) She did not complete many tasks because "[t]hey seem[ed] too big and overwhelming." (Tr. 173.) Her stress level had increased. (Tr. 177.) For many questions, Plaintiff wrote "See Previous." (Tr. 171-78.) In January 2006, Plaintiff's husband completed an updated function report. (Tr. 163.) Her husband stated "See Previous" for almost all of the questions. (Tr. 163-70.)

### v.  Consultative Examination

Plaintiff completed a mental status examination with Licensed Psychologist Lynne E. Johnson, M.S. on November 2, 2005. (Tr. 534.) Ms. Johnson observed that Plaintiff drove herself

to the appointment and appeared to be in significant pain when she moved. (Tr. 534.) Plaintiff statements concern her physical activities were comparable to her first functional reports. (Tr. 534-35.) Ms. Johnson found that Plaintiff performed well in the following areas: reality contact, memory, abstract capacity, judgment, insight, and intellectual functioning. (Tr. 536.) Ms. Johnson found mild limitation in Plaintiff's concentration and information. (Tr. 536.) Ms. Johnson concluded that Plaintiff's depression and possible personality characteristics "played a significant role in the severity of her subjective pain." (Tr. 537.) Ms. Johnson concluded that Plaintiff "suffer[ed] from a chronic moderate Depressive Disorder which [did] not appear to interfere with her activities of daily living significantly" and "[h]er prognosis was guarded to poor." (Tr. 537.) Ms. Johnson further concluded that Plaintiff's "level of depression would not interfere with her ability to tolerate workplace stressors." (Tr. 537.) Ms. Johnson diagnosed Plaintiff with dysthymic disorder and pain disorder associated with both psychological factors and medical problems. (Tr. 537.) She assessed Plaintiff's GAF to be 55. (Tr. 537.)

### vi. Psychiatric Review Technique & Mental Residual Functional Capacity Assessment

In November 2005, R. Owen Nelson, Ph.D., L.P. completed a psychiatric review technique for Plaintiff's application for DIB. (Tr. 538.) Dr. Nelson concluded that Plaintiff had a medically determinable impairment that did not precisely satisfy the diagnostic criteria for affective disorders. (Tr. 541.) Dr. Nelson assessed Plaintiff's functional limitations as follows: She had mild restriction of activities of daily living. (Tr. 548.) Plaintiff had moderate difficulty maintaining social functioning. (Tr. 548.) Dr. Nelson reviewed Ms. Johnson's report and concluded that Plaintiff had a severe impairment that did not meet or equal a listing impairment. (Tr. 550.)

On November 23, 2005, Dr. Nelson completed a mental residual functional capacity assessment. (Tr. 552.) Dr. Nelson noted marked limitations in Plaintiff's ability to understand and remember detailed instructions, and carry out detailed instructions. (Tr. 552.) Dr. Nelson noted moderate limitations in Plaintiff's ability to perform activities within a schedule and be punctual, work in coordination with or proximity to others, complete a normal workday and workweek, interact appropriately with the general public, and respond appropriately to changes in work setting. (Tr. 552-53.) This assessment was affirmed by James Alsdurf on March 3, 2006. (Tr. 616.)

A social security mental capacities report was completed on May 9, 2006. (Tr. 620.) The report concluded that Plaintiff's limitations were entirely related to her physical symptoms and her depression and cognitive impairments were secondary to her physical symptoms. (Tr. 620.)

### vii.   Physical Residual Functional Capacity Assessment

Dr. Charles T. Grant completed a physical residual functional capacity assessment on October 10, 2005. (Tr. 530.) He concluded as follows: Plaintiff could occasionally lift and carry 20 pounds (Tr. 524); she could frequently lift 10 pounds (Tr. 524); she could stand and/or walk about six hours in an eight-hour workday (Tr. 524); she could sit for about six hours in an eight-hour workday (Tr. 524); and she could push and/or pull an unlimited amount. (Tr. 524.) He reviewed her diagnoses and concluded: "It is unclear if any of this adds up to a severe impairment, but her symptoms are partially credible and reduce the RFC to light." (Tr. 525.) He noted that the treating and examining source statements regarding Plaintiff's physical capacities were in file. (Tr. 529.)

On February 23, 2006, B. Farrell conducted a pulmonary case analysis and concluded that Plaintiff did not have severe pulmonary impairment. (Tr. 607.) On February 24, 2006, J.

DeBorja conducted a surgical case analysis and concluded that Plaintiff's new medical evidence was prior to her consultative examination in November 2005 was insufficient to support allegations of worsening musculoskeletal condition. (Tr. 608.) On February 27, 2006, G. McCormack completed a rheumatology case analysis and concluded that her credibility was questionable, but her pain and fatigue warranted her "DDS" severity rating and residual functional capacity. (Tr. 609.) On March 1, 2006, R. Toro completed a neurology case analysis and concluded that Plaintiff's restless leg syndrome, mild obstructive sleep apnea, and migraine headaches were all non-severe impairments. (Tr. 610.)

### viii.  Administrative Hearing

A hearing before an administrative law judge (ALJ) was conducted on June 29, 2007. (Tr. 1251.) Plaintiff testified about her conditions as follows: She was disabled by her illness and her pain. (Tr. 1260.) Her illnesses include neuropathy in her extremities, degenerative disc disease, arthritis in her lower back, migraines, sleep apnea, fibromyalgia, chronic fatigue, complications from gastric bypass surgery, dry eyes, blurry vision, early stages cataracts, severe restless leg syndrome, depression, carpal tunnel surgery, irritable bladder syndrome, hyperthyroidism, asthma, Raynaud's Syndrome, left shoulder impingement, and virtually no cartilage in her left knee. (Tr. 1260.) She took 23 different medications, which caused her to sometimes feel nauseated and sleepy or tired. (Tr. 1264.) She increased her "as-needed" pain medications when she needed to be active. (Tr. 1303.) Her pain was constant and it averaged six on a scale of zero through ten. (Tr. 1288.) Her doctors have told her not to lift too much weight because of her back. (Tr. 1289.) She had good days and bad days. (Tr. 1301.)

Plaintiff testified about her activities of daily living as follows: She last worked in 2004, but she last worked fulltime in 1997. (Tr. 1261.) She could not do work as a landfill manager

now because she could not handle the stress and workload, and she could not reliably show up. (Tr. 1268.) Her work for the law firm was "too hard." (Tr. 1270.) Her work for the City of Hanover was too stressful. (Tr. 1271.)  She could not work as a bookkeeper because her hands hurt and she could not sit for long periods of time.  (Tr. 1272.)  She had not looked for work since July 2004 because she had not felt well.  (Tr. 1263.)  Plaintiff testified that her pain was manageable until February 2004. (Tr. 1298.)

Plaintiff further testified as follows: She did not sleep through the night due to pain. (Tr. 1283.) She watched television in the early morning and the afternoon. (Tr. 1286.) Plaintiff watched television laying down, sitting, and standing. (Tr. 1300.) She dressed every day, paid her family's bills, wrote checks, balanced the checking account, did some light housekeeping (i.e., cleaned the bathroom stool, swept, and vacuumed), occasionally cooked, ate out once per week, occasionally washed dishes, did laundry 25 percent of the time, took out the trash, and grocery shopped by herself and pushed the cart.  (Tr. 1259, 1273-75, 1277.) She could lift and carry one gallon. (Tr. 1276.) She had problems reading and comprehending because her eyes got sore, she got tired, and her hands went numb. (Tr. 1258.) She did not use the computer, but she did go online and checked her e-mail once per week. (Tr. 1258.) She stopped doing her hobbies a year and half before the hearing, but she did some embroidery for Christmas presents. (Tr. 1276. 1290.) Up until six weeks prior to the hearing she walked her dog ten blocks, three times per week. (Tr. 1275.) At the time of the hearing Plaintiff could walk four blocks. (Tr. 1276.) She planted five plants one week before the hearing. (Tr. 1290.) She used a riding lawn mower once recently, but more so in 2005 and 2006. (Tr. 1290.) Although Plaintiff did not regularly visit people, she saw one of her sons four times per week and the other son once per month. (Tr. 1294.)

Plaintiff further testified as follows: She could stand five minutes before needing to sit and she could sit about one hour. (Tr. 1276.) She could drive short distances by herself, but over long drives she would get sick and her legs would hurt. (Tr. 1278.) During four of the past winters, she and her husband drove to Florida in their coach and spent the winter there. (Tr. 1279.) In Florida they fished once per week on their boat. (Tr. 1280.) She occasionally went fishing on her boat in Minnesota as well, but had only gone once during the year preceding the hearing. (Tr. 1289, 1302.) When she was in Florida, she sometimes searched for sea shells. (Tr. 1292.) When in Florida, she used her electric golf cart to get around. (Tr. 1292.)

Edward Utities testified as the vocational expert. (Tr. 52.) The ALJ presented the vocational expert with a hypothetical individual with limitations identical to all those testified to by Plaintiff. (Tr. 1311.) The vocational expert identified Plaintiff's limitations as pain, chronic fatigue, inability to use her hands, comprehension, and blurred vision. (Tr. 1311-12.) The vocational expert concluded that a person with the aforementioned limitations would not be able to perform work as a bookkeeper or to work on a regular and consistent basis. (Tr. 1312.)

The ALJ presented the vocational expert with a hypothetical individual who was identical to Plaintiff in all relevant characteristics, who had limitations identical to all those testified to by Plaintiff, and who had the capacity to perform light work. (Tr. 1312.) The vocational expert concluded that such an individual could perform all of Plaintiff's past work. (Tr. 1312.)

The ALJ presented that vocational expert with a third hypothetical individual who was identical to the second hypothetical individual, but in addition to the residual functional capacity to perform light work, the individual had a marked limitation in her ability to complete detailed complex tasks, and the mental residual functional capacity to concentrate on, understand, and remember repetitive instructions; to tolerate brief, infrequent and superficial contact with co-

workers; handle supervision; to tolerate and respond to the stress of routine repetitive work; and had moderate limitations in her ability to interact appropriately with the general public. (Tr. 1313.) The vocational expert concluded that such a hypothetical individual could not perform Plaintiff's previous work, but such an individual could perform light bench work assembly operations, such as sub-assembler, small parts assembler, fishing rod assembler, and vacuum bottler assembler. (Tr. 1313.) The vocational expert testified that there are 5,000 such jobs in Minnesota. (Tr. 1314.)

The ALJ presented that vocational expert with a third hypothetical individual who was identical to the second hypothetical individual, but the individual has a mental functional capacity consistent with the residual functional capacity assessment performed in the present case, and the individual is limited to sedentary work with the option to sit or stand. (Tr. 1314.) The vocational expert concluded that such a hypothetical individual could not perform Plaintiff's previous work, but could perform work as final assembler, fishing reel assembler, lamp shade assembler, "and many other similar sedentary sit down repetitive assembly occupations" of with there are more than 5,000 positions in Minnesota. (Tr. 1314.) The vocational expert noted that the Dictionary of Occupational Titles does not classify jobs based upon the sit or stand option. (Tr. 1314.)

The vocational expert testified that if the individual in the aforementioned hypotheticals would be unavailable for work at unpredictable times in excess of two days per month, then such an individual could not maintain competitive employment. (Tr. 1315.) The vocational expert also testified that if a hypothetical individual described above had a substantial pace limitation or a substantial concentration limitation, then such an individual could not maintain competitive employment. (Tr. 1316-17.)

III.   **ANALYSIS**

a.   <u>**Standard of Review**</u>

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quotation omitted).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis."  *Id.* (quotation omitted).

The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (stating that the ALJ's determination must be affirmed even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  *Gavin*, 811 F.2d at 1199. In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir.1993).  If it is possible to reach two inconsistent positions from the evidence, then the court must affirm that decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992).

To be entitled to DIB, a claimant must be disabled. 42 U.S.C. § 423(a)(E).  A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505. The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. § 404.1520(a)(4). The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. *Id.* at § 404.1520(a)(5)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

### b.  <u>Residual Functional Capacity</u>

Plaintiff does not dispute the ALJ's determination regarding the first three steps of the sequential process or the ALJ's determination that Plaintiff lacks the RFC to perform her past work. Pl.'s Mem. at 12-13, Dec. 17, 2010. Plaintiff raises a discrete argument relative to the ALJ's RFC determination.

In the present case, the ALJ concluded that Plaintiff had the RFC to perform light work. The ALJ states at the beginning of his extensive residual functional capacity analysis that his determination was based upon the findings and opinions of the state agency physicians and Plaintiff's reported activities of daily living; however, a reading of the ALJ's entire RFC analysis supports that the ALJ based his decision on more than these two sources of evidence. In addition to these two sources of evidence, the ALJ based his RFC determination on the following: First,

the ALJ determined that Plaintiff's statements concerning her extent and limiting effect of her impairments were not entirely credible. Second, the ALJ concluded that chiropractor Howard Johnson's opinion was contradicted by "Dr. Holmbert's" finding or opinion and was contradicted by Plaintiff's reported activities.[9] Third, the ALJ accorded little weight to the opinions of Drs. Kuhlmann and Balfanz because their opinions were inconsistent with their treatment notes and Plaintiff's reported activities.  Finally, the ALJ accorded "no weight" to the mental capacities assessment from May 2006 because the mental health provider based his or her opinion on Plaintiff's subjective description of her pain and opined about Plaintiff's physical limitations, which are outside of the mental health provider's expertise.

Plaintiff argues that the ALJ's determination of Plaintiff's residual functional capacity is not supported by substantial evidence in the record as a whole because the ALJ's determination is based solely upon the opinion of Dr. Charles T. Grant, a non-treating and non-examining medical source, who did not have access to Plaintiff's entire medical record. Pl.'s Mem. at 12-13, Dec. 17, 2010. In addition, Plaintiff contends that the ALJ erred by according little weight to the opinion of Dr. Kuhlmann.  *Id.* at 13.  Plaintiff argues that the present action should be remanded for the ALJ to contact Dr. Kuhlmann for clarification of the inconsistencies between his treatment notes and his opinions.[10] Defendant opposes Plaintiff's motion.

After reviewing the record as a whole and the ALJ's decision, this Court concludes that, for the reasons set forth below, the ALJ's RFC determination is supported by substantial evidence on the record as a whole.

---

[9] Based upon the ALJ's citations, this Court presumes that the ALJ meant "Holmberg" rather than "Holmbert."

[10] Plaintiff does not challenge that ALJ's credibility determination, the ALJ's decision to reject chiropractor Howard Johnson's opinion, the ALJ's decision to accord little weight to the opinions of Dr. Balfanz, or the ALJ's decision to accord no weight to the mental capacities assessment from May 2006.

In steps four and five, the ALJ assesses an individual's residual functional capacity (RFC). 20 C.F.R. § 404.1520(a)(4)(iv). RFC is defined as the most a claimant can do despite the limitations of the individual's impairments. *Id.* at § 404.1545(a)(1). The RFC to perform light work in defined by 20 C.F.R. § 404.1567(b).

In assessing RFC, the ALJ considers "all of the relevant medical and other evidence." 20 C.F.R. § 505.1545(a)(3). "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence. The ALJ, however, still bears the primary responsibility for assessing a [Plaintiff's RFC] based on all relevant evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (citations and quotation omitted.)

Medical evidence includes "medical opinions." 20 C.F.R. § 404.1527(b). An ALJ must consider medical opinions from treating and nontreating sources, *id.* at § 404.1527(d), and an "ALJ must resolve conflicts among the various opinions." *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009).  "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight.  By contrast, the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Jenkins v. Apfel*, 196 F.3d 922, 924-25 (8th Cir. 1999) (quotations omitted.)  Nevertheless, "[w]hile the opinion of a treating physician is entitled to substantial weight, it is not conclusive because the record must be evaluated as a whole. Moreover, a treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion." *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007) (citation and quotation omitted); *see* 20 C.F.R. § 404.1527(d)(6) (stating that the ALJ must consider "any factors . . . which tend to support or contradict the [treating physician's] opinion."); *Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993); *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000).  But, a non-examining, non-treating

physician's RFC assessment cannot constitute substantial evidence to support the ALJ's RFC determination if the non-examining, non-treating physician's RFC assessment was not based upon the full record in the case. *Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995).

"'Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the [Plaintiff's] burden to press his case.'" *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)); 20 C.F.R. § 404.1545(a)(3). Developing the record includes seeking additional evidence or clarification when the report from a treating source contains a conflict or ambiguity. 20 C.F.R. § 404.1512(e)(1). Developing the record may also include arranging for consultative examination if necessary. 20 C.F.R. §§ 404.1512(f), 404.1545(a)(3). But, the ALJ does not need to further develop the record where "additional information would . . . add[] nothing to the ALJ's deliberative process." *Halverson v. Astrue*, 600 F.3d 922, 934 (8th Cir. 2010). Thus, "[w]here 'the ALJ's determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations,' the [Plaintiff] has received a 'full and fair hearing.'" *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010) (quoting *Halverson*, 600 F.3d at 933).

In the present case, there is substantial evidence on the record as a whole to support the ALJ's RFC determination, including "medical evidence" in the form of Dr. Holmberg's treatment records and Plaintiff's statements concerning her activities to support the ALJ's RFC determination. *Guilliams*, 393 F.3d at 803; *see also Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (affirming an ALJ's RFC determination where, in addition to the consulting physician's opinion, the ALJ "relied on the contemporaneous opinions of [a treating physician] and the evaluation of a consulting physician"). In addition to Dr. Grant's RFC assessment, the

ALJ cited the medical records of Dr. Holmberg, who treated Plaintiff in April 2004 and July 2005. In April 2004, Dr. Holmberg concluded that Plaintiff had low back pain and her MRI showed "a very small disc herniation." (Tr. 450, 452.) Following Plaintiff's epidural, she reported to Dr. Holmberg that 75 percent of her pain was gone. (Tr. 449-51.) On July 25, 2005, Dr. Holmberg noted some limitation in the range of motion of her lumbar spine, but her "[l]ower extremities show[ed] normal motion, normal stability, normal sensation, normal circulation, normal strength, normal reflexes, normal pulses, and normal skin exam." (Tr. 447.) These findings are consistent with Dr. Grant's RFC assessment.

Dr. Grant's assessment also supports the ALJ's RFC determination. Dr. Grant—a non-treating, non-examining state consultant—completed his physical RFC assessment in October 2005. (Tr. 530.) First, in February 2006, Dr. Grant's assessment was affirmed by other non-treating, non-examing physicians who benefitted from updated records. (Tr. 608.) Second, with the exception of Dr. Kuhlmann's opinion evidence, Plaintiff has not identified medical evidence that postdates Dr. Grant's assessment and that supports that Plaintiff's condition deteriorated between October 2005 and the date of the hearing in June 2007.  Conversely, Plaintiff's SLE was in remission throughout 2006 and 2007 (Tr. 561, 778), and in August 2006, Dr. Wallerstein noted that Plaintiff's "[l]umbar forward bending initially self limited at about 45 to 50 degrees but with coaching to flex at the hips instead of back she was able to forward bend to about 80 degrees" and he also noted that Plaintiff's hip range of motion was normal and Plaintiff did "not appear to have any motor deficits." (Tr. 734; *see also* Tr. 297-98, 360, 397, 705-08, 780.) Furthermore, Plaintiff described her pain at the hearing consistent with the pain she reported in 2001 and 2002. (*Compare* Tr. 1288 *with, e.g.*, Tr. 933, 960.)

In addition to the above medical evidence, the ALJ's RFC determination is supported by substantial evidence in the form of Plaintiff's own statements to her care providers, to the Commissioner within her application, and to the ALJ during the hearing. All of these statements support that Plaintiff engages in robust activity. The records supports that Plaintiff took road trips after the alleged onset date, in years 2003, 2004, 2005, and 2006. (*See* Tr. 310, 346, 347, 557, 683, 837, 905.) Plaintiff's medical records also describe Plaintiff engaging in activities after the alleged onset. (*See* Tr. 366, 430, 474, 780, 837, 840.) Plaintiff testified that she dressed every day, paid her family's bills, wrote checks, balanced the checking account, did some light housekeeping (i.e., cleaned the bathroom stool, swept, and vacuumed), occasionally cooked, ate out once per week, occasionally washed dishes, did laundry 25 percent of the time, took out the trash, grocery shopped by herself and pushed the cart, could lift and carry one gallon, walked her dog, gardened, mowed the lawn, fished on a boat, collected sea shells, and drove an automobile and a golf cart.  (Tr. 1259, 1273-77, 1280, 1290, 1292.)

Plaintiff's primary contention seems to be that the ALJ should have sought clarification from Dr. Kuhlmann, a physician who treated Plaintiff in October 2004 and January, August, and December 2005. The ALJ considered Dr. Kuhlmann's 2006 and 2007 opinions in which he opined that Plaintiff could lift five pounds occasionally, could stand and walk for less than two hours in an eight-hour workday, sit for less than two hours in an eight-hour workday, and could be expected to miss in excess of two days per month. (Tr. 27.) The ALJ accorded "very little weight to these opinions" because Dr. Kuhlmann's treatment notes do not support such severe limitations and these opinions are inconsistent with Plaintiff's reported activities of daily living. (Tr. 27.)

As far as Dr. Kuhlmann's opinion is concerned, the ALJ did not err in according it less weight where it was unsupported by his treatment records and inconsistent with Plaintiff's testimony concerning her activities. *Woolf*, 3 F.3d at 1214; *Craig*, 212 F.3d at 436.  In addition, there is no indication from Dr. Kuhlmann treatment records that he performed any examination on Plaintiff in August or December 2005 and Drs. Grant and Holmberg's reports are more recent to the hearing date then Plaintiff's January 2005 visit to Dr. Kuhlmann, which included an examination, but dealt exclusively with her digestive tract issues. *See Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009) (""[A]n ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence.").

Furthermore, the ALJ did not err in choosing not to seek clarification from Dr. Kuhlmann. First, clarification of Dr. Kuhlmann's opinion would not refute the fact that his opinion was inconsistent with Plaintiff's statements. Second, the hearing was of a significant length—over two hours—and the ALJ questioned Plaintiff at length, including questioning her on specific statements that she made to her treating physicians. *Contra Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994). Third, the record before the ALJ was voluminous, including treatment records from numerous treating physicians who treated Plaintiff before, concurrently, and after Dr. Kuhlmann. Thus, it is questionable how an additional medical opinion would have added to the ALJ's deliberative process, much less how additional clarification from Dr. Kuhlmann, in particular, would have added to the ALJ's deliberative process. *Halverson*, 600 F.3d at 934.

Thus, for the reasons set forth above, this Court concludes that the ALJ's RFC determination was based upon substantial evidence. In reaching this conclusion, this Court is

mindful that a "determination of residual functional capacity is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," *Krogmeier*, 294 F.3d at 1024, and the Court should not reverse the ALJ's determination merely because evidence may exist to support the opposite conclusion. *Mitchell*, 25 F.3d at 714.

## IV.  RECOMMENDATION

Based upon the record and memoranda, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Docket No. 11) be **DENIED**; the Commissioner's Motion for Summary Judgment (Docket No. 18) be **GRANTED**.

Dated:          August 15, 2011                                *s/ Tony N. Leung*
                                                        Tony N. Leung
                                                        United States Magistrate Judge


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before      August 30, 2011 .